**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| THE RMR GROUP LLC | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-1923 |
| | ) | |
| DH COMPANIES, LLC, DESSIN HAUS | ) | |
| COLLECTIVE LLC, SCOTT HILLIG, LAUREN | ) | |
| HILLIG, AND LISA HILLIG. | ) | |
| | ) | |
| *Defendants.* | ) | |

## **COMPLAINT**

Plaintiff The RMR Group LLC ("RMR" or "Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants DH Companies, LLC ("DH"), Dessin Haus Collective LLC ("DHC"), Scott Hillig, Lauren Hillig, and Lisa Hillig (the "Hilligs") (the Hilligs, DH and DHC are collectively referred to herein as the "Defendants"), and states the following in support thereof:

### **PARTIES**

1.      RMR is a limited liability company formed and existing pursuant to the laws of Delaware, with its primary place of business located at Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458. The RMR Group Inc., a Maryland corporation, is currently the sole member of RMR.

2.      DH is a Virginia limited liability company comprised of one member, Scott Hillig, who is a citizen of Virginia. Upon information and belief, DH's principal place of business is located at 7591 Coppermine Drive, Manassas, Virginia 20109.

1

3.      DHC is a Tennessee limited liability company comprised of two members, Lauren Hillig and Lisa Hillig, both of whom are citizens of Virginia. Upon information and belief, DHC's principal place of business is located at 1033 Demonbreun Street, Suite 300, Nashville, Tennessee 37203.

4.      Upon information and belief, Scott Hillig resides in and is a citizen of Virginia.

5.      Upon information and belief, Lisa Hillig resides in and is a citizen of Virginia.

6.      Upon information and belief, Lauren Hillig resides in and is a citizen of Virginia.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy is more than $75,000.00.

8.      Venue is proper as to DHC pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims occurred in Manassas, Virginia, which lies within this judicial district. Additionally, venue is proper to DH and the Hilligs as they are citizens of Virginia and DH's principal place of business is located in Manassas, Virginia.

## PRELIMINARY STATEMENT

9.      Plaintiff incorporates by reference as if fully set forth herein each and every allegation set forth above.

10.     This is an action by Plaintiff, a national asset management company, to recover at least $2,700,000.00 in misappropriated project funds and damages for additional, unjustified costs caused by DH, and, in the event DH has been purposely undercapitalized or is otherwise judgment-proof, to hold accountable those who attempted to evade liability through a corporate shell.

11.     Plaintiff entrusted millions of dollars to DH as the purchasing agent for RMR who was tasked with procuring and delivering furniture, fixtures, and equipment for dozens of hotel

2

renovation projects. These funds were provided solely for project-related purposes—not as loans or investments.

12.     Upon information and belief, DH collapsed financially and, in an attempt to escape its liability to Plaintiff, the Hilligs, without notice to RMR, formed a new entity—Dessin Haus Collective LLC—to carry on the same business, with the same leadership, same employees, same operations, and same clients, all while absconding with Plaintiff's funds.

13.     After discussions over a number of months to close out the parties' relationship with RMR, DH and its counsel went completely dark when confronted with the issue of the improperly retained funds. DH and its counsel have not responded to any of Plaintiff's communications since August 2025.  A visit to DH's office found it abandoned and dark.

14.     Plaintiff brings this action against DH, DHC, and the Hilligs—the individuals behind DH and DHC—to recover the funds taken by DH and recoup the damages caused by Defendants, plus interest, costs, and fees.

## FACTUAL BACKGROUND

15.     Plaintiff incorporates by reference as if fully set forth herein each and every allegation set forth above.

16.     RMR is a nationally respected asset management company that specializes in commercial real estate. RMR primarily provides management and advisory services to real estate owners, overseeing tens of billions of dollars in assets and hundreds of properties nationwide.

17.     With a portfolio that spans dozens of hotel properties across the United States, RMR is entrusted by institutional investors and global hotel brands to manage, improve, and protect high-value hospitality assets, including but not limited to hotel properties. Its responsibilities include overseeing capital improvements and management renovations,

coordinating vendors, and ensuring the timely and cost-effective handling of property upgrades on behalf of hotel brands like Hyatt, Sonesta, and others.

18.    DH is a Virginia-based procurement agent that Plaintiff retained to execute certain work relating to the procurement, warehousing, and delivery of furniture, fixtures, and equipment ("FF&E") and operating supplies and equipment ("OS&E") for hotel projects across the country.

19.    DH held itself out as a professional purchasing agent with deep industry experience capable of executing procurement and related services competently for Plaintiff's hospitality projects. In that capacity, DH served as an intermediary between Plaintiff and various manufacturers, suppliers, and logistics vendors.

20.    On January 6, 2022, RMR and DH entered into a Professional Services Agreement ("2022 PSA") (attached hereto as **Exhibit A**) whereby DH undertook to provide procurement services for seventeen Hyatt Place hotel locations across the country. *See* Exhibit A at Statement of Work.

21.    On July 31, 2023, the parties entered into a second agreement for DH to provide procurement services for nine Sonesta hotel locations across the country (the "2023 PSA," and together with the 2022 PSA, the "Services Agreements"). *See* 2023 PSA (attached hereto as **Exhibit B**) at Projects & Statement of Work.

22.    Under the Services Agreements, DH was to provide various procurement services for Plaintiff's hotel projects, including but not limited to (i) preparing budgets, (ii) purchasing FF&E and/or OS&E at the lowest cost possible, (iii) preparing regular reports on project and invoicing status, (iv) sourcing and tendering the installation of all purchased FF&E and/or OS&E, and (v) issuing purchase orders to third-party vendors and suppliers necessary to procure materials

and services to complete the renovation work (together with DH's other obligations under the Services Agreements, the "Services").

23.    Under the 2022 PSA, the Services also included coordinating with any and all installation vendors to ensure that all FF&E and OS&E installation schedules were properly reviewed and aligned with the overall construction schedule for each of the Hyatt Place hotel locations. DH was obligated to:

- assist in bid solicitation for FF&E installation, warehousing, and transportation;

- review proposed FF&E and OS&E installation schedules for consistency with project milestones;

- monitor the installation companies' progress, including labor hours and on-site manpower;

- ensure installation was proceeding on schedule and within budget; and

- review and track change orders and any additions to the scope of work.

*See* Exhibit A at Scope of Work, Section 3.12.

24.    DH materially failed to fulfill these obligations by, among other things, (i) not adequately coordinating the FF&E and OS&E installation schedules with the overall construction timeline for certain Hyatt Place locations, (ii) failing to properly monitor installation vendors' progress, and (iii) failing to mitigate foreseeable delays or inefficiencies.

25.    As a direct result of these failures, Plaintiff was forced to incur substantial additional costs in excess of $900,000.00. These costs were incurred due to project delays and associated "go backs," or situations in which previously completed or partially-completed work had to be performed again due to mismanagement and improper sequencing.

26.    For example, DH's actions caused FF&E delays at two Hyatt Place hotel projects—Detroit and Indianapolis—causing additional handling costs in excess of $16,000.00. Similarly, delays in the delivery and installation of various materials, including but not limited to vinyl

wallcovering, required Plaintiff to implement temporary paint finishes in elevator lobbies at its San Antonio, Dallas, and El Paso Hyatt Place locations, resulting in no less than $15,000.00 in fees.

27.    Moreover, as part of the budget and invoicing process, DH neglected and ultimately evaded its obligations for budgeting, invoicing, and financial accountability, in an ultimate attempt to abscond with millions of dollars in cash that incontestably belongs to Plaintiff.

28.    The 2022 PSA provides in relevant part that DH was responsible for creating a "detailed line item FF&E / OS&E budget" and providing a "final FF&E budget for [RMR's] approval . . ." *See* Exhibit A at Statement of Work. As part of the invoicing process, Section 3(B) of the 2022 PSA states that that DH "shall present an invoice to [RMR] monthly. The invoice shall indicate the nature of the Services, Deliverables and work performed . . . and any reasonable expenses incurred by DH with appropriate receipts . . . ." *See* Exhibit A at Section 3(B).

29.    Similarly, the 2023 PSA provides DH "will be responsible for evaluating the FF&E as finally designed and specified to insure that same can be purchased and installed within the amounts as established by the Budget." Exhibit B at Section 12(C). The invoicing process contemplated by the 2023 PSA required DH to provide "monthly progress reports . . . showing: schedule for open issues, budget variance report, invoicing status, [and] expediting report." *Id*. at Projects & Statements of Work. Instead of abiding by these procedures, DH engaged in a scheme to obtain RMR funds with the ultimate goal of using them for non-project related purposes.

30.    Soon after executing the 2022 PSA for the Hyatt Place projects, DH approached Plaintiff with a request for Plaintiff to provide DH with access to, and sole control of,  working capital to enable, according to DH, efficient purchasing of FF&E and OS&E and eliminate potential delays in purchasing the same.

31.     Based on its own calculation of the value of the FF&E and OS&E for the Hyatt Place projects, DH estimated the total FF&E and OS&E budget to be $19,873,145.88. On March 1, 2022, DH invoiced Plaintiff for approximately half that amount or $7,746,372.50, which was promptly paid by Plaintiff on or around March 4, 2022.  DH represented to Plaintiff that payment of working capital was standard industry practice and would allow DH to make purchases efficiently by quickly releasing purchase orders to third-party vendors and without waiting for authorization or reimbursement from Plaintiff.

32.     DH acknowledged its obligation to safeguard the working capital and use it solely for the Hyatt Place hotel projects.

33.     Thereafter, DH made an additional four requests for working capital. In reliance on DH's assurances and representations, Plaintiff provided DH a total of $19,873,145.88 in working capital for the Hyatt Place hotel projects.

34.     DH made similar request to Plaintiff for working capital during the course of the Sonesta hotel projects under the 2023 PSA.

35.     In reliance on DH's assurances, Plaintiff provided DH with a total of $22,868,512.80 in working capital for the Sonesta hotel projects based on no less than 33 requests for payment by DH.

36.     In sum, Plaintiff provided to DH no less than $42,741,658.70 in working capital for the Hyatt Place and Sonesta hotel projects under the Services Agreements (the "Deposited Amount").

37.     At no point during the parties' relationship did DH inform Plaintiff of its financial instability or its intentions to use the working capital on non-RMR projects and/or to abscond with the "lump" funds.

38.    To the contrary, DH continued to submit invoices for the Services, including through DH's Chief Financial Officer, Defendant Lisa Hillig. DH also continued to submit funding requests for FF&E and OS&E, representing through those requests that it remained financially sound and fully capable of performing its obligations.

39.    For example, in connection with a Sonesta project, Plaintiff provided DH with no less than $3,164,160.66 in working capital. These funds were distributed in separate installments over a 14-month period, culminating in January 2025, by which point, upon information and belief, DH was already experiencing significant financial distress. Even as it harbored the intent to funnel that money toward other purposes unrelated to the Services, DH did not inform Plaintiff that it was experiencing financial difficulties yet continued to issue invoices to Plaintiff to maximize its own cash position.

40.    Plaintiff reasonably relied on DH's representations and disbursed tens of millions of dollars to DH between 2022 and 2023.

41.    In 2025, Plaintiff discovered that DH had not accounted for, and had apparently retained or misdirected, at least $1,868,715.84 of the Deposited Amount (the "Retained Amount"). Specifically, DH had not spent and refused to return $804,530.15 in unused capital funds provided by Plaintiff for the Hyatt Place hotel projects and $1,064,185.69 in unused capital funds provided by Plaintiff for the Sonesta hotel projects. DH refuses to explain what happened to this money.

42.    The Retained Amount was not committed to purchases, not held in trust, and not otherwise earmarked for use on the projects under either of the Services Agreements. It was excess funds and the sole property of RMR, and yet DH failed and refused to return it, and has now absconded with it.

43.    Both Services Agreements explicitly contemplate the return of the Retained Amount:

> Upon termination or other expiration of this Agreement and as a condition to any payment by Manager, Vendor shall forthwith return to [RMR] all papers, materials *and other properties* held by [DH] for purposes of performance of this Agreement. In addition, [DH] will assist Manager in orderly termination of this Agreement as may be necessary for the orderly, non-disruptive business continuation of [RMR] and the Project.

*See* Exhibits A and B at Section 7(b) (emphasis added).

44.    The Services Agreements expired on or around April 11, 2025.

45.    On August 18, 2025, counsel for Plaintiff made a formal written demand for return of the Retained Amount. To date, DH has failed to respond.

46.    Upon information and belief, while DH was accepting working capital from Plaintiff and representing to Plaintiff that the funds would be used on RMR projects, the Hilligs secretly formed DHC as a repository for assets they intended to funnel out of DH for their own benefit.

47.    Upon information and belief, the principals and/or owners of DH conspired to form, and in fact formed, DHC in 2024 at DH's headquarters located at 7591 Coppermine Drive, Manassas, Virginia, for the sole purpose of insulating DH from its liabilities and debts, including its obligation to return the Retained Amount.

48.    Upon information and belief, once it was created and capitalized with assets fraudulently transferred from DH, DHC assumed all of DH's operations, took over its client base, and began performing the same services DH previously offered, using the same personnel, assets, and infrastructure.

49.    In or around March 2025, Defendant Lauren Hillig, as Managing Partner of DHC, created a post on LinkedIn indicating that DHC was seeking employees for hire at its offices in

Nashville or Virginia (attached hereto as **Exhibit C**). Ms. Hillig's LinkedIn post indicated that DHC's Virginia office was located at 10432 Balls Ford Road, Suite 120, Manassas, Virginia. Exhibit C. This is the same address that appeared on invoices submitted by DH to Plaintiff pursuant to the Services Agreements.

50.    Upon information and belief, Lauren Hillig worked for both DH and DHC from August 2024 through February 2025 before DH ceased operations in or around February 2025.

51.    Upon information and belief, all of DH's former employees transferred to DHC or were otherwise terminated from employment at DH in or around February 2025.

52.    On July 24, 2025, RMR employees visited DH's office in Manassas, Virginia, finding nothing but a vacant office space with no furniture and several delivery notices left at the front door.

53.    DHC was not formed as a legitimate new business, but rather an illicit cache for DH's corporate assets, designed to avoid DH's liabilities and debts, and benefit from the Retained Amount, while continuing its business unaltered.

54.    Upon information and belief, the assets, business relationships, infrastructure, and client goodwill of DH were transferred to DHC under the direction of the Hilligs without adequate—or any—consideration and DHC was used as a vehicle to continue operating the same business while leaving behind DH's outstanding liabilities.

55.    Upon information and belief, DHC continues to maintain a mailing address in Manassas, Virginia, the same city where DH was headquartered and conducted its business.

56.    DHC does business under the name "Dessin Haus Collective;" Plaintiff is informed and believes "Dessin Haus" is the intended meaning or branding behind the original "DH" in DH Companies, LLC's name.

57. Upon information and belief, DHC has assumed DH's client base and is actively trading on the goodwill developed through DH's prior business dealings. Indeed, DHC holds itself out in the marketplace as a continuation of DH by, among other things, providing the same services previously offered by DH. Namely, DHC represents that it offers comprehensive, high-end project services for industries, including procurement of premium materials and products, logistics management, warehousing, and installation services.

58. DHC also advertises its experience in the industry, including projects with former clients. For example, on public platforms including LinkedIn, DHC markets itself as having performed or currently performing project work for certain branded hotel properties—some of which DH previously served as Plaintiff's procurement agent.

59. In sum, DHC is DH by another name.

60. Upon information and belief, other vendors and partners of DH have pursued claims or are attempting to recover unpaid amounts from DH relating to similar procurement projects. These unpaid obligations, like the obligations to return the Retained Amount, remain unresolved to date.

**COUNT ONE - BREACH OF CONTRACT**
**AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR**
**AND THE HILLIGS AS ALTER EGOS**

61. Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

62. Plaintiff and DH entered into the valid and enforceable Services Agreements for hotel renovation services.

63. The 2022 PSA obligated DH to ensure the performance and timely completion of the Services.

64.     DH materially breached the Services Agreements by failing to, among other breaches, (i) properly review and coordinate FE&E and OS&E installation schedules, (ii) prevent or address delays in material delivery and installation, and (iii) avoid and/or mitigate costly rework and go-backs.

65.     Moreover, Section 3 of both the 2022 PSA and 2023 PSA set out the payment terms for DH's services, satisfaction of which was made through payments independent of the Retained Amounts.

66.     DH breached these clauses by effectively charging a much higher price, through the simple breach of retaining millions of dollars beyond the prices set by the Services Agreements and refusing to return it.

67.     In addition, Section 7(b) of the Services Agreements state in relevant part that:

> Upon termination or other expiration of this Agreement and as a condition to any payment by [RMR], [DH] shall forthwith return to [RMR] all papers, materials and other properties held by [DH] for purposes of performance of this Agreement.

68.     Following expiration of the Services Agreement, and despite a formal demand by Plaintiff, DH charged an excess price and has retained at least $1,868,715.84 of the pre-funded amounts provided by Plaintiff without any justification in material breach of Sections 3 and 7(b) of the 2022 PSA and 2023 PSA.

69.     In particular, DH did not spend on the Services, and refused to return, (i) $804,530.15 in unused capital funds provided by Plaintiff for the Hyatt Place hotel projects and (ii) $1,064,185.69 in unused capital funds provided by Plaintiff for the Sonesta hotel projects.

70.     DH was obliged to return these unused capital funds under the Services Agreements' clear language.

71.     In sum, Plaintiff fulfilled all of its obligations under the Services Agreements.

72.    As a direct and proximate result of DH's breaches of the Services Agreements, Plaintiff has incurred damages in excess of $2,700,000.00 and is entitled to recover all damages caused by DH's breach of the Services Agreements together with interests, costs, and such other remedies as the Court deems just and proper.

73.    To the extent DH lacks assets to pay these damages, the Hilligs are personally liable for DH's contract breach. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate existence of its own; (ii) their control over DH caused DH to breach the Services Agreements and make it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH in a manner (through actual or constructive fraudulent transfer of funds) that has unjustly enriched them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the foregoing.

74.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is liable by virtue of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or directors between DH and DHC. DHC has taken control of most or all of DH's assets, including its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a transaction between affiliated companies orchestrated by family members—the Hilligs—for no consideration in an attempt to shield DH's liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations of DH.

**COUNT TWO – UNJUST ENRICHMENT**
**AGAINST ALL DEFENDANTS**
**(IN THE ALTERNATIVE TO COUNT ONE)**

75.     Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

76.     Plaintiff conferred a benefit upon DH in the form of the Deposited Amount, which DH represented would be used solely for specific RMR projects. The Retained Amount remains unspent and yet has not been returned despite demand therefor.

77.     Upon information and belief, Defendants received and retained the benefit of the Retained Amount by using it, directly or indirectly, to fund Defendants' operations, clients, onboarding, or asset acquisition.

78.     Defendants have knowledge of the source of the Retained Amount and continue to operate using assets and goodwill developed with Plaintiff's funds.

79.     It would be inequitable for Defendants to retain the benefit of the Retained Amount without compensation to Plaintiff.

80.     As a result of Defendants' unjustly retained benefit, Plaintiff has suffered, will continue to suffer, and is entitled to recover damages in excess of $1,868,715.84 as well as for attorneys' fees, costs, and pre- and post-judgment interest.

**COUNT THREE – BREACH OF BAILMENT**
**AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR**
**AND THE HILLIGS AS ALTER EGOS**

81.     Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

82.    Upon DH's assurances that the Deposited Amount would be exclusively used for RMR-project purposes, Plaintiff agreed to provide working capital to DH for the limited and specific purpose of providing the Services.

83.    Plaintiff delivered to DH the Deposited Amount to be used solely in connection with the performance of the Services.

84.    DH accepted the Deposited Amount and undertook to manage and disburse them for the limited purpose of performing the Services.

85.    Upon acceptance, a bailment relationship arose between Plaintiff (as bailor) and DH (as bailee), whereby DH held the Deposited Amount for Plaintiff's benefit, with the express or implied obligation to return a portion of the funds (the Retained Amount) not used in accordance with the purpose of the bailment.

86.    DH performed the Services for which the Deposited Amount was provided but failed and refused to return the Retained Amount, despite demand by Plaintiff.

87.    DH's retention of the Retained Amount constitutes a breach of their duty as bailee and a breach of the bailment relationship.

88.    Moreover, the Hilligs are personally liable for DH's breach of its duty as bailee. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate existence of its own; (ii) their control over DH caused DH to breach its duty as bailee and make it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH in a manner (through actual or constructive fraudulent transfer of funds) that has unjustly enriched them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the foregoing.

89.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is also liable by virtue of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or directors between DH and DHC. DHC has taken control of most or all of DH's assets, including its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a transaction between affiliated companies orchestrated by family members—the Hilligs—for no consideration in an attempt to shield DH's liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations of DH.

90.    As a result of DH's breach of bailment, Plaintiff has suffered, will continue to suffer, and is entitled to recover damages in excess of $1,868,715.84 as well as for attorneys' fees, costs, and pre- and post-judgment interest.

## COUNT FOUR– CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFER
### AGAINST ALL DEFENDANTS

91.    Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

92.    Upon information and belief, the Hilligs are the owners, officers, and/or controlling individuals of DH and DHC.

93.    DH, the Hilligs, and DHC acted in concert pursuant to the common scheme and design to commit a fraudulent transfer in violation of Massachusetts General Laws, Chapter 109A, and all other applicable state laws governing fraudulent transfers.

94.    Specifically, DH, the Hilligs, and DHC agreed and conspired to misappropriate funds from Plaintiff while fraudulently concealing DH's financial instability and orchestrate the creation of DHC and the dissolution of DH to avoid liabilities.

95.     DH, DHC, and the Hilligs acted in concert to accomplish the unlawful retention of the Retained Amount through fraudulent misrepresentations, concealments, and/or omissions and the creation of DHC to continue the same operations without returning the Retained Amount to Plaintiff.

96.     These actions were performed pursuant to a shared plan with the intent to hinder, delay, and/or defraud Plaintiff, and each Defendant committed acts in furtherance of the plan.

97.     DHC was formed with the knowledge and participation of DH and the Hilligs, and DHC benefits directly from the conspiracy to commit fraud by assuming DH's business without its liability.

98.     The Defendants are jointly and severally liable for the fraudulent transfer.

99.     As a result of Defendants' civil conspiracy to commit a fraudulent transfer, Plaintiff has suffered, will continue to suffer, and is entitled to damages in excess of $1,868,715.84 as well as for attorneys' fees, costs, and pre- and post-judgment interest.

**COUNT FIVE – ACTUAL FRAUDULENT TRANSFER
AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR
AND THE HILLIGS AS ALTER EGOS**

100.     Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

101.     This cause of action is brought pursuant to Massachusetts General Laws, Chapter 109A, and all other applicable state laws governing fraudulent transfers.

102.     In the course of their relationship, DH and, either directly or through DH, the Hilligs made material misrepresentations to Plaintiff concerning the use of the Retained Amount, the operational status of DH, and the financial integrity of the procurement process.

103.    Specifically, DH and the Hilligs represented that the entire Deposited Amount would be used solely for designated project-related purposes and the Services, and that DH was capable and capitalized to fulfill its obligations under the Services Agreement. These representations were made repeatedly during invoice and funding requests.

104.    Upon information and belief, at the time these representations were made, DH was financially distressed or insolvent, and the Hilligs had already initiated plans to cease operations and form DHC with the intent to cease operations of DH.

105.    DH did not disclose and intentionally concealed the impending collapse of DH or the creation of DHC to assume DH's business. Instead, DH and its principals continued to solicit funds and submit invoices to Plaintiff without disclosing these facts, thereby creating a false impression that DH was financially stable and capable of completing the Services.

106.    Plaintiff justifiably relied on DH's and the Hilligs' omissions and ongoing representations of operational capability and financial health and continued to provide funds.

107.    Upon information and belief, DH subsequently transferred the Retained Amount to DHC and/or the Hilligs (or for the benefit of DHC and/or the Hilligs), with actual intent to hinder, delay, or defraud Plaintiff and other creditors.

108.    DH, having caused and perpetrated this deception and taken over DHC's business and assets while benefiting from the fraudulent transfer, is liable for these acts and resulting damages.

109.    The recipients of these funds are jointly and severally liable for those damages.

110.    Moreover, the Hilligs are personally liable for DH's fraudulent transfer. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate

existence of its own; (ii) their control over DH caused DH to fraudulently transfer the Retained

Amount and make it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH

in a manner (through actual or constructive fraudulent transfer of funds) that has unjustly enriched

them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the

foregoing.

111.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is liable by virtue

of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or

directors between DH and DHC. DHC has taken control of most or all of DH's assets, including

its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or

other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a

transaction between affiliated companies orchestrated by family members—the Hilligs—for no

consideration in violation of the laws against actual fraudulent transfer in an attempt to shield DH's

liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations

of DH.

112.    As a result of these fraudulent transfers, Plaintiff has been damaged in the amount

of at least $1,868,715.84 that was never used for its intended purpose of benefiting Plaintiff and

Plaintiff's customers and is entitled to damages in excess of $1,868,715.84 as well as for attorneys'

fees, costs, and pre- and post-judgment interest.

## COUNT SIX – CONSTRUCTIVE FRAUDULENT TRANSFER
### AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR
### AND THE HILLIGS AS ALTER EGOS (IN ADDITION AND IN THE ALTERNATIVE TO COUNT FIVE)

113.    Plaintiff hereby incorporates by reference its allegations contained in the foregoing

paragraphs as if fully rewritten herein.

114.    This cause of action is brought pursuant to Massachusetts General Laws, Chapter 109A, and all other applicable state laws governing fraudulent transfers.

115.    In the course of their relationship, DH and the Hilligs made material misrepresentations to Plaintiff concerning the use of funds, the operational status of the company, and the ongoing performance of the Services.

116.    Specifically, DH and the Hilligs represented that the Deposited Amount would be used solely for designated project-related purposes, and that DH was capable and capitalized to fulfill its obligations under the Services Agreements. These representations were made repeatedly during performance of the Services, including at the time DH made invoice and funding requests to RMR.

117.    Upon information and belief, at the time of making these representations, DH was financially distressed or insolvent, and the Hilligs had already agreed and made plans to cease DH operations and form DHC.

118.    Upon information and belief, DH subsequently transferred assets, including but not limited to the Retained Amount, to DHC or to the Hilligs.

119.    Upon information and belief, DH did not receive reasonably equivalent value in exchange for the transfers made to DHC and/or the Hilligs.

120.    Upon information and belief, DH made such transfers while engaged, or was about to engage, in a business or transaction, including the obligations arising therefrom, for which its remaining assets were unreasonably small to cover the business or transactions and obligations contemplated by DH, or DH intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

20

121.    Moreover, the Hilligs are personally liable for DH's fraudulent transfer. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate existence of its own; (ii) their control over DH caused DH to fraudulently transfer the Retained Amount and make it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH in a manner (through actual or constructive fraudulent transfer of funds) that has unjustly enriched them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the foregoing.

122.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is liable by virtue of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or directors between DH and DHC. DHC has taken control of most or all of DH's assets, including its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a transaction between affiliated companies orchestrated by family members—the Hilligs—for no consideration in violation of the laws against constructive fraudulent transfer in an attempt to shield DH's liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations of DH.

123.    As a result of these fraudulent transfers, Plaintiff has been damaged in the amount of at least $1,868,715.84 as well as for attorneys' fees, costs, and pre- and post-judgment interest.

<u>**COUNT SEVEN – CONVERSION**</u>
**AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR
AND THE HILLIGS AS ALTER EGOS
(IN ADDITION AND IN THE ALTERNATIVE TO COUNTS FIVE AND SIX)**

124.    Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

125.    At all relevant times, Plaintiff had a possessory interest in, and the right to immediate possession of the Retained Amount that Plaintiff deposited with DH for the exclusive purpose of being used for project-related expenses pursuant to the Services Agreements.

126.    DH accepted the Retained Amount under the express understanding that such funds remained the property of Plaintiff, and that DH held the Retained Amount, which was to be used solely for project-related expenses pursuant to the Services Agreements.

127.    At no time did DH assert or have a valid claim of ownership over the Retained Amount.

128.    DH exercised dominion and control over the Retained Amount inconsistent with Plaintiff's ownership rights, including but not limited to treating the funds as its own and refusing to return the Retained Amount upon demand.

129.    DH's own internal tabulations and records concede that the current balance of the Retained Amount remains due and owing to Plaintiff.

130.    Despite demands by Plaintiff, DH has failed and refused to return the Retained Amount or any portion thereof, thereby depriving Plaintiff of its rightful property.

131.    Accordingly, by DH's refusal to return the Retained Amount, DH has committed a conversion of funds, and RMR has been damaged thereby in the amount of no less than $1,868,715.84.

132.    Moreover, the Hilligs are personally liable for DH's conversion of funds. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate existence of its own; (ii) their control over DH caused DH to convert the Retained Amount and make it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH in a manner

(through actual or constructive fraudulent transfer of funds) that has unjustly enriched them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the foregoing.

133.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is liable by virtue of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or directors between DH and DHC. DHC has taken control of most or all of DH's assets, including its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a transaction between affiliated companies orchestrated by family members—the Hilligs—for no consideration in an attempt to shield DH's liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations of DH.

## COUNT EIGHT – M.G.L.A. 93A § 11 (UNFAIR AND DECEPTIVE PRACTICES)
### AGAINST ALL DEFENDANTS, INCLUDING DHC AS SUCCESSOR
### AND THE HILLIGS AS ALTER EGOS

134.    Plaintiff hereby incorporates by reference its allegations contained in the foregoing paragraphs as if fully rewritten herein.

135.    This cause of action is brought pursuant to Massachusetts General Laws, Chapter 93A, § 11, and all other applicable state laws governing unfair and deceptive practices.

136.    Plaintiff is a business entity engaged in commerce, providing management, advisory, and real estate services.

137.    DH is a business entity engaged in commerce providing design, development, and project-management services.

138.    At all times relevant, Plaintiff and DH were engaged in a commercial relationship. Plaintiff provided the Retained Amount to DH for the sole and express purpose to facilitate the performance of the Services, specifically the purchase of FF&E and OS&E.

139.    DH represented to Plaintiff that the Retained Amount would be used exclusively for the projects contemplated by the Services Agreements, and Plaintiff reasonably relied on these representations in distributing the funds.

140.    Upon completion of the Services and expiration of the Services Agreements, DH retained and refused to return the Retained Amount without justification.

141.    DH's conduct constituted a misrepresentation and an unwarranted retention of funds, amounting to an unfair and deceptive act or practice in violation of M.G.L.A. 93A § 11.

142.    DH's actions meet the recognized standards of "unfairness" under Massachusetts law, including but not limited to violation of reasonable commercial standards, the unjustified refusal to return property belonging to Plaintiff, and conduct that falls within established concepts of unfair dealing in business relationships.

143.    DH's misconduct occurred in the course of trade or commerce and directly caused Plaintiff to suffer monetary loss and other damages.

144.    Plaintiff was injured at its principle place of business in Newton, Massachusetts as a result of DH's unfair and deceptive acts. Among other things, RMR's operations are conducted at its principal place of business in Massachusetts, and Defendants' aforementioned deceptive statements and/or omissions were directed to RMR's employees located in Massachusetts.

145.    As a result of DH's unfair and deceptive practices, Plaintiff has been damaged in the amount of at least $1,868,715.84 that was unjustifiably retained by Defendants, benefiting Defendants and Defendants' customers, and is entitled to damages in excess of $1,868,715.84 as well as for attorneys' fees, costs, and pre- and post-judgment interest.

146.    Moreover, the Hilligs are personally liable for DH's violation of M.G.L. 93A, §11. They are alter egos of DH and/or are subject to corporate veil-piercing of DH. Plaintiff will show

that the Hilligs so completely and dominantly controlled DH that: (i) DH was a sham with no separate existence of its own; (ii) their control over DH caused DH's misconduct and made it judgment-proof; (iii) they purposely undercapitalized or de-capitalized DH in a manner (through actual or constructive fraudulent transfer of funds) that has unjustly enriched them and deprived Plaintiff of its own money; and (iv) Plaintiff suffered injury as a result of the foregoing.

147.    To the extent DH lacks assets to pay Plaintiff's damages, DHC is liable by virtue of successor liability. There is nearly perfect commonality of owners, managers, officers, and/or directors between DH and DHC. DHC has taken control of most or all of DH's assets, including its goodwill, and is continuing DH's business in its stead. Plaintiff will show that the "sale" or other transfer of DH's assets did not occur as a *bona fide* arms-length transaction. Rather, it was a transaction between affiliated companies orchestrated by family members—the Hilligs—for no consideration in an attempt to shield DH's liabilities. DHC is a mere continuation of DH and is therefore liable for the debts and obligations of DH.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing factual allegations and applicable legal theories, whether stated herein above or determined at a later time based on the evidence presented at trial, Plaintiff respectfully requests a judgment in its favor against Defendants, jointly and severally, on its claims for relief, in the amount of the damages or in an amount to be determined at trial, as well as attorneys' fees, pre- and post-judgment interests and costs; all equitable remedies available under Virginia law; and all other just and appropriate relief determined by the Court.

Dated: October 31, 2025                     Respectfully submitted,


                                            */s/ Laura A. Seferian*
                                            Laura A. Seferian (VA # 92510)

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
Telephone:  312.624.6423
Email: lseferian@beneschlaw.com